IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| DAVID LEE GARCIA d/b/a AFFORDABLE OVERHEAD DOOR CO., § § § *Plaintiff,* § § v. § § GLOBAL DEVELOPMENT STRATEGIES, § INC. and GLOBAL DISTRIBUTION § SERVICES, INC., § § *Defendants*. | Civil Action No.  SA-13-CV-1158-XR |

## ORDER

On this date, the Court considered Defendants' motions to compel arbitration. Doc. Nos. 16 & 21. After careful consideration, these motions are DENIED. Alternatively, Defendant Global Development Strategies seeks dismissal for lack of personal jurisdiction. That motion is also DENIED. Doc. No. 16.

### BACKGROUND

This case arises out of Plaintiff David Garcia's trademark infringement claims against Defendants Global Development Strategies ("Development") and Global Distribution Services ("Distribution Services"). The factual backdrop of this case is complicated by the numerous corporate entities that Defendants and their affiliates utilize to operate their nation-wide garage door business. Several of these entities have been involved in trademark litigation with Garcia over their allegedly infringing use of his "Affordable" trademark. In 2004, Garcia filed suit against Overhead Garage Door Services ("Overhead Garage"), Garage Door Services

1

Company ("Door Services") and James Stephens (collectively "Original Defendants").[1]  This case later settled.  On April 4, 2008, Plaintiff filed another trademark infringement suit against these Defendants.[2]  On July 18, 2008, the parties agreed to dismiss the case.  *See Garcia v. Overhead Garage Door Services, Inc. et al*, No. SA-08-CV-0278-XR, Doc. No. 13.  It is unclear whether the parties entered into a written settlement agreement at that time, as no such agreement has been provided to the Court.  Instead, Plaintiff and the Original Defendants executed a written settlement agreement (the "Settlement Agreement") on March 5, 2010.  Doc. No. 16, Ex. B.  The Settlement Agreement contains the arbitration clause that the Defendants seek to enforce.  *See Id.*

 The current Defendants were not parties to these prior cases.  Prior to the Settlement Agreement, on July 1, 2008, Door Services had assigned all of its rights and liabilities to Defendant Development on July 1, 2008.  Doc. No. 16, Ex. C.  On August 1, 2008, Defendant Distribution Services registered to do business in Texas and appears to be Development's in-state subsidiary.  Doc. No. 18, Ex. 11.

 On December 20, 2013, Plaintiff filed the instant lawsuit against Development and thereafter joined Defendant Distribution Services as a party. Doc. No. 18.  On March 20, 2014, Development filed this motion to compel arbitration.  Doc. No. 16.  In addition, Development contends that this Court lacks personal jurisdiction over it.  *Id.*  On April 28, 2014, Distribution Services joined in the motion to compel arbitration.  Doc. No. 21.

---

[1] No. SA-04-CV-1041-FB
[2] No. SA-08-CV-0278-XR

## DISCUSSION

*1. Defendants' Motion to Compel Arbitration*

A motion to compel arbitration requires the Court to assess whether the parties agreed to arbitrate the dispute in question. "This determination involves two considerations: (1) whether there is a valid agreement to arbitrate between the parties; and (2) whether the dispute in question falls within the scope of that arbitration agreement." *Tittle v. Enron Corp.*, 463 F.3d 410, 418-19 (5th Cir. 2006) (quoting *Webb v. Investacorp*, 89 F.3d 252, 258 (5th Cir. 1996)). In addition, a court must ensure that there are no external legal barriers to enforcing an arbitration clause. *Id.* "Generally under the FAA, state law governs whether a litigant agreed to arbitrate, and federal law determines the scope of the arbitration clause." *Fleetwood Enters., Inc. v. Gaskamp*, 280 F.3d 1069, 1077-78 (5th Cir. 2002).

Arbitration agreements are generally considered matters of contract law. *See Grigson v .Creative Artists Agency, L.L.C.*, 210 F.3d 524, 528 (5th Cir. 2000). As an initial matter, neither of the Defendants were signatories to the Settlement Agreement that contains the arbitration clause they seek to enforce. This does not necessarily preclude Defendants from enforcing the clause, "[b]ecause 'traditional principles' of state law allow a contract to be enforced by or against nonparties to the contract through "assumption, piercing the corporate veil, alter ego, incorporation by reference, third-party beneficiary theories, waiver and estoppel." *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 631 (2009).

Defendants briefly posit several theories of how, as non-signatories, they are entitled to enforce the arbitration clause. First, both Defendants argue that they can enforce the Settlement Agreement as assignees. Doc. No. 16 at 7; Doc. No. 21 at 7. Defendants base this

argument off the fact that Door Services, a signatory, assigned all of its assets to Development on July 1, 2008. *See* Doc. No. 15, Ex. C. Accordingly, Defendants argue that they are the successors-in-interest to Door Services's right as a signatory to enforce arbitration against Plaintiff. There are several problems with the assignment argument. As a general principle, assignments, like arbitration agreements, are considered matters of contract law. *Pape Equipment. Co. v. I.C.S., Inc.*, 737 S.W.2d 397, 399 (Tex. App.—Houston [14th Dist.] 1987, writ ref'd n.r.e.). Since Door Services only assigned its assets and liabilities to Development, and not Distribution Services, it appears that only Development can make the argument that it has a contractual right by assignment to enforce the arbitration agreement.[3] Cf. *Phoenix Network Tech. v. Neon Sys.*, 177 S.W.3d 605, 620 (Tex. App.—Houston [1st Dist.] 2005, no pet.) (Assignee can enforce contractual rights of assignor).

Furthermore, the assignment from Door Services to Development occurred on July 1, 2008. *See* Doc. No. 15, Ex. C. In contrast, Door Services's right to compel arbitration against Plaintiff was only created by the execution of the Settlement Agreement, which occurred on March 5, 2010, nearly two years after the assignment. *See* Doc. No. 15, Ex. B. These dates are important. Under Texas contract law, a party can typically only assign property (or contractual rights) that it already possesses or reasonably expects to possess. *See Univ. of Texas Med. Branch at Galveston v. Allan*, 777 S.W.2d 450, 452-53 (Tex. App.—Houston [14th Dist.] 1989, no writ) ("As a general rule, in order to be assignable, an estate or interest in property must have an actual or potential existence."). Significantly, at the time Door Services transferred its assets and liabilities to Development, it did not possess the contractual right to compel arbitration against Plaintiff.

---

[3] Door Services never assigned its right to arbitrate to Distribution Services.

4

In addition, the language of the assignment itself offers no indication that Door Services intended to automatically transfer all of its future assets and obligations to Development. Furthermore, it is highly doubtful that Door Services could have plausibly assigned the right to arbitrate it received in 2010 to Development in 2008. It is a generally accepted principle that once an assignment is made, the assignor loses all right to enforce the contract. *See River Consulting, Inc. v. Sullivan*, 848 S.W.2d 165, 169 (Tex. App.—Houston [1st Dist.] 1992, writ denied), disapproved on other grounds by *Formosa Plastics Corp. USA v. Presidio Engineers & Contractors, Inc.*, 960 S.W.2d 41 (Tex. 1998). Since the 2008 assignment predated the 2010 Settlement Agreement, accepting Defendants' logic would necessarily imply that Door Services had no ability to enforce the very Settlement Agreement that it signed because it had already assigned away those rights. This is a highly suspect consequence of Defendants' argument and the Court finds that there is no merit in Defendants' contention that they were validly assigned Door Services's right to compel arbitration.

Next, Defendants suggest that they were the intended third-party beneficiaries of the Settlement Agreement. Doc. No. 16 at 10, Doc. No. 21 at 8. Under Texas law, a third-party is a beneficiary of a contract, and can thus to sue to enforce it, if: (1) the signatories intended to secure a benefit for the third-party, and (2) the signatories entered into the contract *directly* for the third-party's benefit. *Basic Capital Mgmt. v. Dynex Commercial Inc.*, 348 S.W. 3d 894, 900 (Tex. 2011) (emphasis added).

Defendants contend that the Settlement Agreement purported to bind all "heirs, representatives, executors, successors and assigns," and that, inasmuch as both Defendants are "successors" to signatory Door Services, they were intended third-party beneficiaries.

Development and Distribution Services would only be Door Services's "successors" if some transfer of assets and liabilities took place *after* Door Services obtained the contractual right to compel Plaintiff to arbitrate.  In addition, there is no evidence that Plaintiff intended to benefit either of the current Defendants, whose existence he was unaware of at the time of the Settlement Agreement.

Defendants' argument that the Settlement Agreement was intended for their direct benefit is weakened by the structure of the contract itself.  While a subsection does purport to bind all "successors," it is noteworthy that no less than ten entities are enumerated as parties to the Settlement Agreement.  Neither of the Defendants were included as parties to the Settlement Agreement, Defendants' argument that they are closely related to the signatories notwithstanding.  Against this backdrop, it is reasonable to infer that if Garcia and Door Services had intended to directly benefit the current Defendants, they would have been listed on the contract as were many of the other corporate entities that have some relationship to Defendants.  In light of the structure of the Settlement Agreement itself, Defendants have not shown that it was clearly the signatories' intent to benefit Defendants.  *See Basic Capital Mgmt*. 348 S.W.3d at 900 (requiring that contract "clearly and fully" manifest intent to confer benefit on third party).

Consequently, the Court finds that the Settlement Agreement does not make Defendants third-party beneficiaries such that they are entitled to enforce the arbitration clause as non-signatories.  There being no grounds for the non-signatories to enforce the agreement, there is no need for the Court to reach Plaintiff's alternate argument that the entire Settlement Agreement is void for fraud.

*2. Development's Motion to Dismiss for Lack of Personal Jurisdiction*

In the alternative, Development seeks dismissal for lack of personal jurisdiction. Doc. No. 16. In support, Development has provided the affidavit of its current Vice-President who avers that Development conducts no business whatsoever in Texas. *See* Doc. 16, Ex. E. However, Plaintiff has presented sufficient facts to establish a *prima facie* case supporting this Court's jurisdiction. *See Felch v. Transportes Lar–Mex SA De CV*, 92 F.3d 320, 326 (5th Cir. 1996) (Party asserting court's jurisdiction must make only *prima facie* case when the Court declines to hold an evidentiary hearing on the jurisdictional question).

It is settled that personal jurisdiction exists if: (1) the Texas long-arm statute confers such jurisdiction; and (2) the exercise of that jurisdiction comports with the Due Process Clause. *Paz v. Brush Engineered Materials, Inc.*, 445 F.3d 809, 812 (5th Cir. 2006) (quoting *Allred v. Moore & Peterson*, 117 F.3d 278 (5th Cir. 1997)). The Texas long-arm statute authorizes courts to exercise jurisdiction over a nonresident defendant who "does business" in the state. TEX. CIV. PRAC. & REM. CODE ANN. § 17.042 (Vernon 2008). Texas courts have interpreted this provision broadly to permit jurisdiction over nonresidents as far as the U.S. Constitution permits. *See Blair Communications, Inc. v. SES Survey Equip. Services, Inc*., 80 S.W.3d 723, 727 (Tex. App.—Houston [1st Dist.] 2002, no pet.). As a result, the only inquiry is whether jurisdiction over the nonresident Defendants would violate the U.S. Constitution. *Religious Tech. Center v. Liebreich*, 339 F.3d 369, 373 (5th Cir. 2003) ("Because the Texas Long Arm Statute is coextensive with the confines of Due Process, questions of personal jurisdiction in Texas are generally analyzed entirely within the framework of the Constitutional constraints of Due Process.").

Well established Supreme Court jurisprudence dictates personal jurisdiction over a nonresident defendant is constitutional when: (1) the defendant has established minimum contacts with the forum state; and (2) the exercise of jurisdiction comports with traditional notions of fair play and substantial justice. *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).  There are sufficient minimum contacts when the nonresident defendant purposefully avails him or herself of the privilege of conducting activities within the forum state, thereby invoking the benefits and protections of its laws. *Id.*

A defendant's contacts with a forum can give rise to either specific or general jurisdiction. *Wilson v. Belin*, 20 F.3d 644, 647 (5th Cir. 1994).  Specific jurisdiction exists when "the defendant has 'purposefully directed' his activities at residents of the forum ... and the litigation results from alleged injuries that arise out of or relate to those activities." *Burger King v. Rudzewicz*, 471 U.S. 462, 472 (1985) (internal citations omitted).  The nonresident's purposeful and deliberate activities in the forum must be such that he could reasonably anticipate being haled into court in that state. *Id.* at 474.  Specific jurisdiction also requires a sufficient nexus between the nonresident's contacts with the forum and the cause of action. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984).

Plaintiff has established a *prima facie* case that Development is subject to specific jurisdiction in this case with respect to Plaintiff's trademark infringement claims.  As an initial matter, Development and/or its affiliates advertise their garage door business in Texas, both on the internet and in the local yellow pages.  *See* Doc. No. 18, Ex. 18.  The parties dispute whether or not these advertisements are sponsored or owned by Development or by one of its many affiliated entities.  However, the Fifth Circuit is clear that "conflicts between the facts

contained in the parties' affidavits must be resolved in the plaintiff's favor for purposes of determining whether a *prima facie* case for personal jurisdiction exists." *Johnston v. Multidata Sys. Intern. Corp.*, 523 F.3d 602, 609 (5th Cir. 2008). Thus, if the Court resolves the factual question of whether Development is advertising in Texas in Plaintiff's favor, it appears as though any trademark infringement claim arising out of that advertising would subject Development to specific jurisdiction here.[4] Regardless of who actually owns the websites that solicit business in Texas, all use the "GDS" trademark, which is owned by Development. This trademark also appears on the warranty policies used by Defendants' independent contractors throughout Texas. Doc. No. 18, Ex. 20. Thus, the evidence shows that Development holds itself out to the public, through the use of its "GDS" trademark, as doing business in Texas.

In addition, Development admits to having entered into an ongoing oral license agreement with Distribution Services, a Texas resident, for the use of its registered "GDS" trademark. Doc. No. 16, Ex. E. By this contract, Development has purposefully availed itself of Texas by entering into a lasting agreement with a Texas company. *See Burger King*, 471 U.S. at 474-75 (contractual arrangement between parties sufficient to confer personal jurisdiction where it contemplated long-term relationship). Trademark infringement liability can extend to parent companies or licensors who permit a subsidiary or licensee to violate another's trademark. *Inwood Laboratories, Inc., v. Ives Laboratories, Inc.*, 456 U.S. 844, 853 (1982). Thus, by licensing its trademark to its in-state subsidiary, Development has taken some affirmative act that is directed at the state which is "related" to this litigation. *See*

---

[4] In a trademark infringement case, a plaintiff must show: (1) ownership of a legally-protectable mark; and (2) infringement by demonstrating a "likelihood" of confusion among consumers. *Bd. of Supervisors for Louisiana State Univ. Agric. & Mech. Coll. v. Smack Apparel Co.*, 550 F.3d 465, 474 (5th Cir. 2008) (internal citations omitted). A trademark infringement cause of action therefore necessarily relates to a party's advertising activities.

*Guidry v. United States Tobacco Co.*, 188 F.3d 619, 628 (5th Cir. 1999) ("[e]ven an act done outside the state that has consequences or effects within the state will suffice as a basis for jurisdiction in a suit arising from those consequences if the effects are seriously harmful and were intended or highly likely to follow from the nonresident defendant's conduct."). As a result, the Court finds that it has specific jurisdiction over Development.

In addition, Plaintiff has established a *prima facie* case that Development is subject to general jurisdiction in Texas. In contrast to specific jurisdiction, which is focused on whether the nonresident's contacts are related to the asserted claims, general jurisdiction exists when the defendant has a "continuous and systemic" presence in the forum. *Helicopteros*, 466 U.S. at 414. The "continuous and systematic contacts test is a difficult one to meet, requiring extensive contacts between a defendant and a forum." *Submersible Sys., Inc. v. Perforadora Cent., S.A.*, 249 F.3d 413, 419 (5th Cir. 2001) (citation omitted). "Random, fortuitous, or attenuated contacts are not sufficient to establish jurisdiction." *Moncrief Oil Int'l Inc. v. OAO Gazprom*, 481 F.3d 309, 312 (5th Cir. 2007) (citation omitted).

There are two alternative theories of how Development could be subject to general jurisdiction in Texas. First, there could be general jurisdiction based on Development's direct business activities here. Development vigorously asserts that, despite the long history of its affiliates and subsidiaries of doing business in the State, it does absolutely no business in Texas. Doc. No. 16, Ex. E. Plaintiff, however, contends that Development is currently doing business in Texas under the Door Services alias. Doc. No. 18 at 8. Again, at this stage of the case factual conflicts relating to personal jurisdiction must be resolved in the plaintiff's favor. *Johnston,* 523 F.3d at 609.

In its motion to compel arbitration, Development primarily grounds its alleged authority to enforce the arbitration clause on the basis of the 2008 assignment in which it acquired all of the assets and liabilities of a Texas company, Door Services. *See* Doc. No. 16, Ex. 5. Now, in its motion to dismiss, Development argues that all of its Texas business is conduct by its subsidiary, Distribution Services. For this corporate history to make sense, Development must have at some point transferred the Texas business assets it acquired from Door Services to Distribution Services. However, it is unclear when, if ever, this transfer occurred. Consequently, it appears likely that for some period of time Development was, as successor to Door Services, doing business in Texas. *See Access Telecom, Inc. v. MCI Telecomm. Corp.,* 197 F.3d 694, 717 (5th Cir.1999) ("[G]eneral jurisdiction can be assessed by evaluating contacts of the defendant with the forum over a reasonable number of years, up to the date the suit was filed.") *see also Perkins v. Benguet Consol. Mining Co.*, 342 U.S. 437, 445-46, 72 S.Ct. 413, 96 L.Ed. 485 (1952) (finding personal jurisdiction where business entity temporarily relocated to forum state and conducted meetings, maintained records and bank accounts, and made business decisions there).

Alternatively, even taking Development at its word that it does no business in Texas, it may nonetheless be subject to the State's general jurisdiction by virtue of the control it has over its Texas subsidiary, Distribution Services. Development's main argument against this Court's jurisdiction is that *all* of its business in Texas is carried out by its subsidiary Distribution Services.[5] Development does not explain, however, how the two companies are meaningfully separate entities. Plaintiff's evidence tends to show that Distribution Services and Development are alter egos, such that general jurisdiction over one confers general

---

[5] It is undisputed that Distribution Services is subject to general jurisdiction in Texas.

jurisdiction over the other. *See Hargrave v. Fibreboard Corp.*, 710 F.2d 1154, 1159 (5th Cir. 1983)("[A] close relationship between a parent and its subsidiary may justify a finding that the parent "does business" in a jurisdiction through the local activities of its subsidiaries.").

In fairness to Development, "the mere existence of a parent-subsidiary relationship is not sufficient to warrant the assertion of jurisdiction over the foreign parent." *Id.* In addition, although relevant to the alter ego analysis, common ownership and common corporate officers are, by themselves, insufficient to confer jurisdiction over the parent. *Id.* at 1060. In this case, however, Distribution Services and Development share more than a common owner and common officers. Although Development contends that only Distribution Services does business in Texas, Plaintiff has provided evidence implying that, with respect to their business operations in Texas, the two entities are interchangeable. For example, Distribution Services does not have its own website. Instead, all traffic is funneled to Development's website which, as noted herein, indicates that some entity affiliated with Development carries on continual business in Texas. Doc. No. 18, Ex. 18. The co-Defendants also share the same trademarks. Consequently, an individual seeking to obtain garage door repair services in Texas would think they were doing business with Development. In fact, they would not even know that Distribution Services existed.

Courts have elaborated multi-factor tests for when a parent may be subject to jurisdiction as its subsidiary's alter ego. Factors to be considered include:

> (1) the parent and the subsidiary have common stock ownership;
> (2) the parent and the subsidiary have common directors or officers; (3) the parent and the subsidiary have common business departments; (4) the parent and the subsidiary file consolidated financial statements and tax returns; (5) the parent finances the subsidiary; (6) the parent caused the incorporation of the subsidiary; (7) the subsidiary operates with grossly inadequate

> capital; (8) the parent pays the salaries and other expenses of the subsidiary; (9) the subsidiary receives no business except that given to it by the parent; (10) the parent uses the subsidiaries property as its own; (11) the daily operations of the two corporations are not kept separate; and (12) the subsidiary does not observe the basic corporate formalities, such as keeping separate books and records and holding shareholder and board meetings.

*Gundle Lining Constr. Corp. v. Adams County Asphalt, Inc.*, 85 F.3d 201, 208–09 (5th Cir. 1996). Here, the parent and subsidiary have common ownership and officers. Although Plaintiff has not provided Defendants' financial information, Defendants do not offer any indication that they have separate finances. Here, the subsidiary appears to solely exist as a middle-man between the parent and the independent contractors who actually conduct the garage repair work for the parent's financial benefit. Thus, it does not appear that Distribution Services has any business of its own. Both Development and Distribution Services were incorporated on the same day in Nevada. Doc. No. 7, Ex. 1. The two parties use joint property, including trademarks and websites, interchangeably. Most importantly, the daily operations do not appear distinguishable and the evidence refutes any notion that Distribution Services maintains "basic corporate formalities" such that they can meaningfully be considered a distinct entity. Defendants purport to have an oral license agreement regulating the use of the "GDS" trademark. The absence of a written agreement suggests a closeness between the parties. Moreover, Defendant's affidavit indicates that "the nature and quality of services provided by Distribution… must satisfy the controls, standards and requirements of Development." Doc. No. 16, Ex. E. Thus, Development's own evidence supports the notion that it is fully in control of Distribution Services.

In this case, Plaintiff has made the requisite showing that Development so controls Distribution Services that its continuous presence in the forum may be fairly attributed to Development Strategies for purposes of asserting jurisdiction over it. *See Gardemal v. Westin Hotel Co.*, 186 F.3d 588, 593 (5th Cir.1999) (describing that under Texas law, the alter ego doctrine "applies 'when there is such unity between the parent corporation and its subsidiary that the separateness of the two corporations has ceased and holding only the subsidiary corporation liable would result in injustice'" (quoting *Harwood Tire–Arlington, Inc. v. Young*, 963 S.W.2d 881, 885 (Tex. App. —Fort Worth 1998, writ dism'd by agr.)).

Plaintiff contends that Development is a nation-wide business that has created under-capitalized "shell" subsidiaries to operate in each state in order to avoid jurisdiction. Doc. No. 18. With respect to its motion to compel arbitration, Development insists that it is so closely related to its affiliated companies that it should be allowed to enforce a contract that it did not sign. With respect to the jurisdictional analysis, however, Development contends that its corporate partners are distinct entities that only operate at arms-length. The Court takes no position on Defendants' corporate structure. However, based upon the facts of this case, the Court concludes that Development maintains sufficient minimum contacts with Texas to render personal jurisdiction constitutionally permissible.

This does not quite end the inquiry because the exercise of jurisdiction cannot offend "traditional notions of fair play and substantial justice." *Intl. Shoe Co.*, 326 U.S. at 320. In conducting this analysis, courts consider: (1) the burden on defendant, (2) Texas's interest in this dispute, (3) plaintiff's interest in obtaining effective relief, (3) the judicial system's interest in efficiency; and (5) the shared interest of the states in furthering social policies.

*World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980).  Whereas the overall burden to establish jurisdiction is on the plaintiff, when a defendant with minimum contacts to a forum state seeks to avoid that state's jurisdiction "he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Burger King*, 417 U.S. at 447.   Here, Development has not claimed that litigating in Texas would be so burdensome as to amount to a constitutional violation.  In fact, Development asked the Court to compel arbitration, presumably in Texas, and so it would be hard for Development to turn around and argue that it cannot reasonably litigate here.  Plaintiff has raised a concern about the ability to obtain effective relief if Development is dismissed, and Texas has a strong interest in promoting a business climate free of trademark infringement.  Consequently, jurisdiction over Development does not offend any notion of "fair play or substantial justice."

## CONCLUSION

In light of the foregoing analysis, Defendants' motions to compel arbitration are DENIED. Doc. Nos. 16 & 21.  Defendant Development's motion to dismiss for lack of personal jurisdiction is also DENIED.  Doc. No. 16.

SIGNED this 7th day of May, 2014.

_____
XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE